City of Chicago, a Municipal Corporation, and People
of the State of Illinois, Plaintiffs-Appellees, v.
Malcolm Lambert, et al., Defendants-Appellants.

**Gen. No. 49,097.**

First District, First Division.

March 9, 1964.

Rehearing denied April 6, 1964.

Falkenberg & Falkenberg, of Chicago, for appellants.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Edward J. Hladis and James R. Thompson, Assistant State's Attorneys, of counsel), for the People of the State of Illinois, appellee. John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Robert J. Collins, Assistant Corporation Counsel, of counsel), for City of Chicago, appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

The defendants, Malcolm Lambert, Wayne Mueller and Clifford Uthene were found guilty in a nonjury trial on charges of having, on March 22, 1962, violated Chap 193, Sec 1-1 of the Municipal Code of the City of Chicago; Chap 38, Sec 26-1 and Chap 38, Sec 27-1 of the Illinois Revised Statutes 1961. This is a consolidated appeal from the judgments.

The record discloses that on the evening of March 22, 1962 the defendants, together with Arthur Brill, James Sipta, Matt Koehl, Dennis Svedman and Don Mueller (a twin brother of Wayne Mueller), drove by automobile from the headquarters of the American Nazi Party at 2124 N. Damen Avenue, Chicago to the State & Lake Theatre in Chicago's loop. Brill and Sipta were 16 years of age. It was the last day showing of a movie entitled "Sergeants Three" in which Sammy Davis, Jr., had a principal part. It was a Thursday evening and the loop stores were open.

They arrived at the destination about 6 p. m. Wayne Mueller, Uthene, Brill and Sipta took signs, a banner and about 100 handbills or leaflets from the car and proceeded to march in front of the theatre.

They all were similarly dressed viz: a white shirt, black trousers, black tie, black shoes, gloves and felt arm bands with an insignia called "odinsrune," the symbol of free enterprise. The signs and banner were carried before the theatre by them and the evidence indicates that these were interchanged during the procession. Uthene and Brill, on occasion, carried the leaflets. There were three signs with markings as follows:

Sign No. 1:
Odinsrune symbol "White Youth Corps"
"Fight Race-Mixing
Don't See Sergeants 3"

On the other side: "Negroes Support Black Muslims"

Sign No. 2:
Odinsrune symbol "White Youth Corps"
Words: "Sammy Davis"
Picture of Sammy Davis
Star of David-"Nior"

On the other side: "How to Be a Jew, Lesson No. 1 By Sammy the Kosher-Coon"

Sign No. 3:
Odinsrune symbol—"White Youth Corps"
"Sammy Davis Jewnior is a Race-Mixer"

On the other side: "White Youth Corps"
4657
Chicago 80 Ill."

The banner displayed the large symbol designating "odinsrune" and the words "Youth Awake." The leaflets mentioned had printed matter on both sides, as follows:

153

# NIGGERS!

# You Too Can Be A Jew !

## IT'S EASY! IT'S FUN! INSULT THE WHITE FOLKS! MAKE MORE MONEY! LOVE THE WHITE WOMEN !!!!

**SAMMY-the-KOSHER-COON SHOWS YOU HOW....IN TEN EASY LESSONS !!**

WHY BE A POOR CHRISTIAN NIGGER WHEN WITH THIS COURSE YOU CAN BECOME A JEW NIGGER AND BE RICH, FAMOUS AND ARROGANT?

THE NEW SAMMY-THE-KOSHER-COON CORRESPONDENCE COURSE SHOWS ORDINARY COONS HOW TO BE SASSY NIGGER JEWS....IN JUST MINUTES A DAY! BE ONE OF US CHOSEN PEOPLE! DON'T WAIT FOR THE PUSSY-FOOT N.A.A.C.P. TO RUN THE WHITE FOLKS OUT! AS A NIGGER-JEW YOU CAN START INSULTING THE COWARDLY WHITE MEN AND LOVING UP THEIR WHITE WOMEN, NOW!

TEN EASY LESSONS SHOW YOU SAMMY-THE-KOSHER-COON'S PROVEN METHOD OF BECOMING A NIGGER-JEW! Here's some of the things you learn: Jewish customs and traditions such as how to force your way into social groups, how to be obnoxious and arrogant, how to throw orange peels and other garbage around in a professional Jewish manner. . .How to HATE, very important to us Jews, -how to brood over every little slight to build up a persecution complex and a hot hate of Christians. . .How to make millions cheating widows and orphans and then get a generous reputation by giving a little away with a lot of publicity. . .How to be a Liberal and to work for Jew Communism while appearing to be an "anti-Communist". . .How to Hate-Hitler and get people believing he killed six millions of us even though we are all over here living it up on the dumb Christians. . .How to bomb synagogues so as to collect the insurance, contribu-tions and sympathy at the same time we blow the hole where we are planning additions, and then get a bunch of Christians electrocuted for it. . .How to convince the White Women that us niggers and Jews have something special the White Men don't have. . .How to strut in public with a white wife. . .How to insult like a Jew. . . . . . . .

## IN ADDITION...

. . .to the wonderful lessons themselves, you also get TEN miracle study-aids, working tools, and the necessary equipment to be a JEW..........

### HERE'S WHAT YOU GET!!

1. Special piece of extra nose, handsomely tinted black, from our New York Jewish Beak-bank, for grafting on so you will look more like a real Jew.

2. Purple beanie for wearing while you are thinking Jew thoughts.

154

3. Hate Manual, for developing proper Jewish attitude toward Christians and for getting them to be ashamed of themselve for wanting to have their Christmas, etc which is an insult to us Jews.

4. Mirror, for practicing special Jewish, "I-smell-sh---eep" expression.

5. Communist Party Card, beautifully engraved in color on parchement water-marked with the Star of David.

6. Synagogue bombing kit, for keeping the anti-semites under control. Gives explicit directions for finding the best kind of Christians to blame it on, and methods of whipping up mass sympathy.

7. Thumb screws, and manual on Jewish business methods.

8. Basket of filthy post cards, for working up into paper-back books for sale to teen-agers, at news stands.

9. Talmud, gorgeously decorated with oil paintings of the five sadistic deaths wished for Jesus Christ inside this Jewish "religious" bokk.

10. Race-mixing color chart,-scientific color-wheel showing exactly the right amount of black, red, yellow, white or brown blood to mix to produce any desired shade of mongrel!

**AMERICAN NAZI PARTY**
**Chicago Headquarters**
**2124 N. DAMEN AVENUE**
**CHICAGO**

## TESTIMONIALS.

Dear Sammy-the-Kosher-Coon:

For years Ah was a ordinary nigger, ugly as a horny toad, an' poor as a church mouse.

Then, one fine day, ah finds yo' mail-order course in a men's room, and studies to be a Jew. Ah sends away for mah nose-graft, and now ah is de toast of de town, 'roun yere. Ah acks so much like a reg'ler Jew dey sends me to Moscow for three trips, and now ah is de civics instructor in de white high school.

Rastus Rosenberg

Gen'muns:

Ah caint say 'nuff 'bout y'all up there in New York, since y'all done so much fer dis ol nigger.

All mah life ah had to be satisfied wid dem dusky cullud gals, till ah takes yo' nigger-jew course and gits ter be a Jew. I like y'all suggest in de course, ah jined de Unitarian Church, and now ah is chairman of de young ladies social group, and mah opportunities is mo' den even ah can handle.

Uncle Mose Ginsburg.

Dear Sammy:

I am an educated Negro, but I was beginning to wonder when the education would pay off. I came up North, where I expected the White Men would step aside for me, like I had heard, but I found they had learned ways of keeping me from getting equal, even though they were'nt open about it like down South.

Then I took your wonderful Negro-Jew course, and discovered that, as you say, the White Men haven't yet been taught to be obedient and respectful to the Negro, but they sure HAVE learned to jump when the Jews tell them tob Even the Southern white men are downright funny to watch, when they think us Jews might get after them. I should be a schmuck and stay a Negrb, --when I can be a Jew, yet! OI! OI!

A Harlem Jew.

## TO HELL WITH the NAACP AND THEIR SNEAKY PROGRAM! IT'S TOO SLOW! WHY WAIT! GET WHITE WOMEN TODAY!

SPECIAL OFFER TO JEWS...
WE ALSO HAVE A LOVELY COURSE FOR JEWS WHO WISH TO BECOME NEGROES, AND ALSO FOR CHINAMEN WISHING TO BECOME INDIANS.

AMERICAN NAZI PARTY
P. O. BOX 1381
ARLINGTON, VIRGINIA

YES! I WANT TO BE A JEW-NIGGER AND GET EQUAL RIGHT AWAY!...........
NAME
ADDRESS
NOSE SIZE
PREFER BLONDES?

155

Lambert, together with Don Mueller and Svedman did not join in the marching but walked into the crowd and observed. At the time the marching began there were few people about but as the procession progressed more gathered until the number reached between 200 to 300 people. The leaflets were held so that the face of one of the sides was visible to those observing and were passed out to persons reaching for them. After some 15 or 20 minutes the marchers and Lambert were placed under arrest and complaints were filed against them. Brill and Sipta were processed through the Family Court and we need not concern ourselves with them here.

Appellants contend that the evidence was not sufficient to justify the conviction.

Sec 193–1–1 of the Municipal Code of Chicago provides:

> "All persons who shall make, aid, countenance or assist in making any improper noise, riot, disturbance, breach of the peace, or diversion tending to a breach of the peace—shall be deemed guilty of disorderly conduct—"

Sec 26–1 of the Criminal Code (Ill Rev Stats 1961, c 38) reads as follows:

> "A person commits disorderly conduct when he knowingly (1) does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace—"

Sec 27–1 of the Criminal Code of 1961 (Ill Rev Stats 1961, c 38) reads:

> "A person commits criminal defamation when, with intent to defame another, living or dead, he communicates by any means to any person matter which tends to provoke a breach of the peace—"

Sec 27–2 reads:

"In all prosecutions for criminal defamation, the truth, when communicated with good motives, and for justifiable ends, shall be an affirmative defense."

Brill, called by the prosecution, testified that he met Lambert when Lambert and Koehl came to his home to check on a letter Brill wrote to the American Nazi Party in Arlington, Virginia. Lambert called him several times thereafter. Brill later came to live at the headquarters at 2124 N. Damen Avenue. Wayne Mueller also lived there. On March 22, 1962 Lambert "Received" . . . "looked us over and saw how we were dressed and read the instructions, the picket instructions, looked over the signs, and saw that everything was straightened out and everything was ready." The leaflets came from Arlington, Virginia by special delivery addressed to "Captain" Lambert. There were not too many people when they started marching but in a few minutes they started congregating. He heard the people making remarks.

Police Sergeant John Fleming testified that he arrived on the scene ten minutes after 6 p. m. He saw people get out of the car in the alley south of the theatre. Four were dressed in white shirts, black ties, shoes and pants and wore insignia. The fifth person was Lambert. Sergeant Fleming saw them marching with the signs and banner. Brill and Uthene took turns distributing leaflets. Lambert stood at the south door of the theatre. He asked Lambert to have them disperse. Lambert said he wouldn't ask them. Until the marching started, there was the normal flow of traffic. Within two or three minutes there were well over 200 people. He heard remarks such as "Is this what we fought a war for to be insulted like this coming back; where do these white M———F———s

157

get the idea of coming up like this causing trouble in the loop." People of Jewish extraction asked why they fought in Germany, Japan and Korea. Several people asked what the police department was going to do about it. Police officer Carducci informed him that a crowd was gathering on Lake Street and he felt this crowd was going to break up the demonstration. He asked the marchers to disperse and they refused and continued marching. He then had them arrested. Lambert was also arrested after he demanded to know by what right the others were taken into custody.

Eugene Zolt testified that he operates a business across the street from the theatre. On Thursdays he has it opened to 9 p. m. He saw some activity in front of the theatre, people running and walking. He walked across the street, pushed through the crowd and was handed a circular when he reached for it. He returned to his store, read the circular and re-crossed the street. He was angry and so were others. He saw a fellow with a baseball bat, another with a pipe. He heard profanity. "It looked like they were ready for violence."

Max Berry testified that he is a haberdasher just north of the theatre. His store was open. While waiting on a customer he observed a negro boy come in, with a bat under his coat, mumbling. About 15 to 20 people came in, one had a sash weight. These people used vile language. He stood in front of the door and tried to talk to them. They pushed him away and walked out. When he went out he saw the police patrol picking up the paraders. The mob started to go toward the signs and there was some trampling of the signs.

Police officer Samuel Carducci testified that the crowd was unusual by their remarks. They were starting to push forward. He was told that a party

was gathering on Lake Street. He went there, saw from 40 to 60 people between the ages of 17 to 25. One said "Officer, get the hell out of here." . . . "We have nothing against you. Get the hell out of here and I am not going to say anymore." They said they wouldn't leave until something was done about the activity. He informed Sergeant Fleming.

Police Lieutenant Sheehan testified that he told Lambert to disperse the pickets and Lambert said he didn't intend to, they were doing nothing illegal. He then ordered their arrest. He had overheard a conversation between two or three people and they said "Lets rush these coppers, they are not doing their job." Another said "Just why can't these people throw those M————F————s out of there." The police then put the pickets in the patrol, someone started to step on the signs and he had to call some police to hold up the crowd.

Lambert, in his own behalf, testified that Brill told him he had an idea to recruit high school students into a white youth organization to combat communism and race-mixing. He thought it was a good idea. They had an odinsrune emblem. Their objective was to gain membership and protest publicly against anything they considered unconstitutional, traitorous to this nation or to their white race. Specifically, they were against the Communist Party and all its affiliates such as the N. A. A. C. P., Congress of Racial Equality and various other organizations, especially such person as Sammy Davis, Jr., who was a symbol of the things they were against such as the mixing of races and religions. Brill frequently told him of his progress. On March 22, 1962 Lambert discussed the picketing of the State & Lake Theatre. In the presence of the others he talked to Brill about the leaflets. He told Brill that as far as he knew the leaflets had never been handed out in the streets and weren't "the type

159

of thing" because it wasn't in very good taste. He would never personally hand them out. He denied ordering them. He had picketed on previous occasions. The sole purpose of the theatre picketing was to exercise their constitutional rights and object to a person such as Sammy Davis, Jr., who has been made the symbol of race-mixing; to discourage the mixing of races and religions. They were pointing out that Sammy Davis, Jr., has made a mockery of his own adopted religion and has held up members of the white race to ridicule. Sammy Davis, Jr., had adopted the Jewish faith and married May Britt, a Swedish girl. He saw a picture of them embracing in the presence of a rabbi who performed the marriage ceremony. May Britt was a Christian of the white Aryan race who was converted to the Jewish faith. The defendants were hoping to arouse public opinion. They were hoping in time to change the thinking of people from a liberal attitude to a different attitude—an attitude where all races would be separate but equal. He said that on the evening in question there was nothing to indicate there was going to be a riot. There was some laughter and calling of names but no threat to the pickets. On cross-examination Lambert said it was an inflammatory leaflet and could make someone angry. It wouldn't make him angry because he was not a Negro or Jew. He was leader of the Chicago Branch of the American Nazi Party until two days before the trial of the instant case. Before the picketing Brill discussed the signs and leaflets with him because he had experience in picketing before and knew the regulations—"what you should do and shouldn't do."

The evidence in the instant case clearly established that the defendants intended to provoke, disturb and alarm the public in a manner that could create a breach of the peace. Their actions were high-

160

ly unreasonable, unjustifiable and did, in fact, alarm and disturb spectators, provoking a breach of the peace. The law does not contemplate standing by until there is a riot. City of Chicago v. Williams, 45 Ill App2d 327, 195 NE2d 425, filed December 31, 1963. The peace of the people is a fundamental function of our democracy. When it becomes evident that the deliberate conduct of a person tends to disturb a great number of people to a breach of the peace, it becomes a duty to restrain such person and hold him accountable. In these days of stress and social unrest the law must effectively act to prevent rioting or mob activity. Here, most clearly, the plans, motives, actions and conduct of the defendants, through their garb, signs, banner, and a most vicious leaflet was intended to incite a major demonstration in one of the busiest business sections of Chicago's loop. We need not conjecture, speculate or guess what the outcome might have been had not the police interfered. Persons may express their feelings on matters of public interest but actions calculated to asperse and degrade other persons because of their race or religion can and do provoke breaches of the peace, violence, riots or other public disturbances. Defendants are responsible for the consequences of their actions. A mere reading of the leaflets refers to Negroes and Jews as people possessing various criminal tendencies, unchastity and degrading sexual inclinations, all of which are "fighting words" liable to cause violence and disorder between the races. The signs were derogatory and indicative of class hatred that, used in such circumstances, were of a nature as to create a clear and present danger which the police had a duty to prevent.

In Beauharnais v. Illinois, 343 US 250 on page 261, the court said: " 'The danger in these times from the coercive activities of those who in the delusion

161

of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions the States may appropriately punish.' " The court again, at pages 258, 259 stated that: "Illinois did not have to . . . await the tragic experience of the last three decades to conclude that wilful purveyors of falsehood concerning racial and religious groups promote strife and tend powerfully to obstruct the manifold adjustments required for free, ordered life in a metropolitan, polyglot community."

■ Lambert contends that he did not participate in the picketing and was not proven guilty of the charges. The evidence clearly establishes the fact that he master-minded the incident and defended it as lawful and proper. There is no question that he, before and during the incident, aided, abetted and planned or participated in the planning of the commission of the offense. He was the guiding light, encouraging youthful boys to demonstrate racial hatred in vulgar, vicious terms with intent to create animosity and produce public unrest. Sec 5–2(c) of the Criminal Code of 1961 provides that: (Ill Rev Stats 1961, c 38, § 5–2(c))

> "A person is legally accountable for the conduct of another when: (c) either before or during the commission, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid such other person in the planning or commission of the offense."

He was legally accountable for their conduct. It was not necessary that he actively engage in the picketing. People v. Rybka, 16 Ill2d 394, 158 NE2d 17 (1959).

162

■ The defendants were guilty of criminal defamation. The scurrilous epithets and statements contained in the leaflets were a low and morally injurious attack on races and religions. The defendants attempted to justify the statements by contending that they were true. They explained "Kosher" meant pure; "coon" was and is used in songs and literature without any offensive imputations. Even if we were to accept this explanation it does not account for the deliberate hyphenating of these words with intent to erase any honest or good motives or for justifiable means. We need not reiterate the signs and the leaflets to establish the defamation of two races and a religion. No one can impute good motives or justifiable means in defendants' conduct even if by a wide stretch of the imagination one could find truth in the statements and legends. The defendants banded, wore special type of attire, and expressed distinct convictions establishing motives unwholesome and contrary to the laws and constitution of our land. People v. Beauharnais, 408 Ill 512, 97 NE2d 343 (1951); People v. Spielman, 318 Ill 482, 149 NE 466 (1925).

■ Defendants challenge the sufficiency of the complaints, relying on Sec 9, Art 2 of the Illinois Constitution which provides: "In all criminal prosecutions the accused shall have the right . . . to demand the nature and the cause of the accusation. . . ." It is defendants' contention that the complaints do not specify with particularity the time, place and persons affected by their action; that a plea in bar might not be imposed if subsequently alleged violations, arising out of the same transactions, were filed against them.

The general rule is that it is sufficient to state the offense charged in the language of the statute, where the statute adequately defines the offense. Where the statute creating the offense does not describe the act

163

or acts which compose it, such acts must be specifically averred in the complaint. The reason for requiring the complaint to be free from all ambiguity is that there should be left no doubt in the minds of the accused and the court of the exact offense intended to be charged, not only that the former may know what he is called upon to meet, but that upon a plea of former acquittal or conviction the record will show, conclusively, the exact offense to which the plea relates. People v. Green, 368 Ill 242, 13 NE2d 278 (1938); People v. Rice, 383 Ill 584, 50 NE2d 711 (1943).

In the instant case, the defendants were charged in the complaints in the language of the statutes. The City Disorderly Conduct complaint charged that on March 22, 1962, they "did make or aid in making an improper noise, riot, disturbance, breach of peace or diversion tending to a breach of the peace within the limits of the city." The State Disorderly Conduct complaint charged that on March 22, 1962 at the City of Chicago, "they knowingly carried signs, placards and distributed handbills, all worded in such unreasonable manner as to alarm and disturb and to provoke a breach of the peace. The Criminal Defamation complaint charged that on March 22, 1962 "they did acts with intent to defame another living or dead in that they communicated to another person or persons matter which tended to provoke a breach of the peace."

The proceedings below indicate defendants had been first charged, in prior complaints, similarly drawn in the language of the statutes, and directed against each of them, individually. Defendants made motions to quash these complaints, and suppress all evidence including the said banners, placards and leaflets upon the assertion that there was an unreasonable search and seizure. The record establishes that there

was no search because the placards, banners and leaflets were in plain view upon a public street. "The mere looking at that which is open to view is not a search." 79 CJS, Searches and Seizures, Sec 1, p 776; People v. Smith, 315 Ill App 671, 43 NE2d 420 (1942); Petteway v. United States, 261 F2d 53 (4th Cir 1958). At no time did defendants move to quash the informations upon any other grounds. These motions were denied; they then moved for a bill of particulars; for an admission of certain facts; for a list of witnesses and for copies of all statements of witnesses. The prosecution filed a bill of particulars, offered to make available the placards and signs upon request, and submitted a list of witnesses. Upon demand made by defendants, the prosecution stated they intended to proceed first with the City Disorderly Conduct complaint and then with the State complaints, and further to consolidate the individual charges into one complaint against all defendants covering each offense. To this defendants did not object but preserved all motions taken by them with respect to the previous complaints.

After a careful reading of the record we believe defendants were fully informed of the exact offenses intended to be charged so that they knew what they were called upon to meet. Their requests for a bill of particulars, for an admission of facts, and for a list of witnesses were granted. The record discloses the following remarks:

"Mr. Ettinger: For the record I want the record to indicate that the defense counsel . . . submitted a request for a bill of particulars which was answered, citing sufficient information, and he indicated . . . to the Court in a lengthy session in your chambers that he was satisfied that he had sufficient information to identify the nature of the crime and the charges against the defendants.

165

"The Court: It will be so indicated."

At no time, therefore, did the defense indicate a dissatisfaction with the bill of particulars supplied, nor did they request a more definite bill. Under these circumstances we may properly assume they were sufficiently apprised of, and were prepared to meet, the issues involved. Defendants could neither expect, nor could the prosecution supply any more information. No more was necessary. People v. Beeftink, 21 Ill2d 282, 171 NE2d 632 (1961).

In addition, we believe the entire record before us would prevent any subsequent prosecution of these defendants for the same offenses. We believe that defendants' rights to a fair trial have not been violated. In Smith v. U. S., 360 US 1, at page 9 the court said: "The Supreme Court of the United States has, in recent years, upheld many convictions in the face of questions concerning the sufficiency of the charging papers. Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused. This has been a salutary development in the law." Niceties and strictness of pleadings are supported only when defendants would be otherwise surprised on trial or unable to meet the charges or prepare their defenses. People v. Woodruff, 9 Ill2d 429, 137 NE2d 809 (1957); People v. Nastario, 30 Ill2d 51, 195 NE2d 144 (1963).

The convictions are affirmed.

Affirmed.

MURPHY, P. J. and BURMAN, J., concur.