Lawrence **LANDRY** et al., Plaintiffs,

v.

**Richard J. DALEY,** Mayor of the City of
Chicago, Cook County, Illinois,
et al., Defendants.

No. 67 C 1863.

United States District Court
N. D. Illinois, E. D.

March 4, 1968.

See also D.C., 280 F.Supp. 929; 280
F.Supp. 938.

Robert L. Tucker, R. Eugene Pincham, Kermit Coleman, Jean F. Williams, Ellis E. Reid, Lawrence E. Kennon, Leonard Karlin, Norman E. Lapping, Irving Birnbaum, Leo E. Halt, Cecil C. Butler, Edward Thomson, Chicago, Ill., Dennis J. Roberts, Newark, N. J., William M. Kunstler and Arthur Kinoy, New York City, for plaintiffs.

John J. Stamas, State's Atty. of Cook County, Edward J. Hladis, Chief of Civil Division, Ronald Butler, Asst. State's Atty., for State officials.

Raymond F. Simon, Corp. Counsel of Chicago, Richard J. Elrod, Asst. Corp. Counsel, Kenneth W. Sain, Asst. Corp. Counsel, for city officials.

Robert Plotkin, Philip W. Moore, Michael L. Shakman, Neil Komesar, Robert Howard, Chicago, Ill., amicus curiae.

## OPINION

WILL, District Judge.

Plaintiffs in this action have challenged the constitutionality of three state statutes and two ordinances of the City of Chicago, as well as the alleged unconstitutional application by defendants of these statutes and ordinances to plaintiffs and other members of the class they purport to represent. In a separate opinion, a three-judge District Court has dealt with the question of the constitutionality of the challenged state statutes. We deal here with the constitutionality of the two ordinances of the City of Chicago.

All of the opinion of the three-judge court relating to the allegations of the complaint, the jurisdiction of the Court, the question of federal forbearance or

abstention, and the constitutional principles involved, is equally applicable here. Rather than repeat those observations, we incorporate them by reference herein and proceed to a consideration of the challenged ordinances.

### The Disorderly Conduct Ordinance

■ Chapter 193, Section 1 of the Municipal Code of Chicago, which is labeled "Disorderly Conduct," provides as follows:

"All persons who shall make, aid, countenance or assist in making any improper noise, riot, disturbance, breach of the peace or diversion tending to a breach of the peace, within the limits of the city; all persons who shall collect in bodies or crowds for unlawful purposes, or for any purpose, to the annoyance or disturbance of other persons; all persons who are idle or dissolute and go about begging; all persons who use or exercise any juggling or other unlawful games or plays; all persons who are found in houses of ill-fame or gaming houses; all persons lodging in or found at any time in sheds, barns, stables, or unoccupied buildings, or lodging in the open air and not giving a good account of themselves; all persons who shall wilfully assault another in the city, or be engaged in, aid, or abet in any fight, quarrel, or other disturbance in the city; all persons who stand, loiter, or stroll about in any place in the city, waiting or seeking to obtain money or other valuable things from others by trick or fraud, or to aid or assist therein; all persons that shall engage in any fraudulent scheme, device or trick to obtain money or other valuable thing in any place in the city, or who shall aid, abet, or in any manner be concerned therein; all touts, ropers, steerers, or cappers, so called, for any gambling room or house who shall ply or attempt to ply their calling on any public way in the city; all persons found loitering about any hotel, block barroom, dramshop, gambling house, or disorderly house, or wandering about the streets either by night or day without any known lawful means of support, or without being able to give a satisfactory account of themselves; all persons who shall have or carry any pistol, knife, dirk, knuckles, slungshot, or other dangerous weapon cancealed on or about their persons; and all persons who are known to be narcotic addicts, thieves, burglars, pickpockets, robbers or confidence men, either by their own confession or otherwise, or by having been convicted of larceny, burglary, or other crime against the laws of the state, who are found lounging in, prowling, or loitering around any steamboat landing, railroad depot, banking institution, place of public amusement, auction room, hotel, store, shop, public way, public conveyance, public gathering, public assembly, court room, public building, private dwelling house, house of ill-fame, gambling house, or any public place, and who are unable to give a reasonable excuse for being so found, shall be deemed guilty of disorderly conduct, and upon conviction thereof, shall be severally fined not less than one dollar nor more than two hundred dollars for each offense."

This ordinance has to be one of the most charming grabbags of criminal prohibitions ever assembled. Some of its provisions are nostalgic though obviously obsolete. Jugglers or touts, ropers, steerers or cappers for gambling houses are today as rare as buggy whips. Obsolescence, however, does not connote unconstitutionality.

Others of the provisions are clearly of current concern. Prohibition against engaging in any fraudulent scheme, device or trick to obtain money or other valuable thing or the obtaining of money or other valuable things by trick or fraud is certainly a proper exercise of the city's police power though it is not generally considered "disorderly conduct." Similarly, the city has a legitimate concern and duty to preserve the peace from forceful or violent breaches thereof whether by individuals or mobs.

It is equally obvious that other portions of the ordinance are both vague, indefinite and overbroad and therefore unconstitutional. Unfortunately, they are so inextricably intertwined with the valid segments that it is impossible to sever them and thereby preserve the latter.

For example, the opening language, "All persons who shall make, aid, countenance, or assist in making any improper noise, riot, disturbance, breach of the peace or diversion tending to a breach of the peace" contains prohibitions which are clearly vague and indefinite, as well as overbroad. What is an "improper noise?" The dictionary defines "improper" in part as "not in accordance with fact, truth or right procedure," and "not in accord with propriety, modesty, good taste or good manners."[1] The definition of "noise" includes "loud, confused or senseless shouting," "sound or a sound that lacks agreeable musical quality or is noticeably loud, harsh or discordant," "any sound that is undesired or that interferes with something to which one is listening," or even alternatively "sound or a sound that is not regarded as unpleasing or that has a pleasing melodious quality" as, for example, "the noise of heavenly choirs."[2]

The number of sounds which are constitutionally permitted and protected and which would fall within the proscription of "improper noise" is infinite. Political campaigns, athletic events, public meetings and a host of other activities produce loud, confused or senseless shouting not in accord with fact, truth or right procedure to say nothing of not in accord with propriety, modesty, good taste or good manners. The happy cacophony of democracy would be stilled if all "improper noises" in the normal meaning of the term were suppressed.

The Supreme Court has held on several occasions that statutes or ordinances prohibiting "noise" are valid only to the extent that they are necessary to the protection of other important public interests, e. g., the prohibition of horn blowing or other noise in a hospital zone. Prohibition of "noise" per se is unconstitutional.[3] And the addition of the vague and indefinite adjective "improper" does not cure the defect.

Not only is making, aiding or assisting in the making of an improper noise a crime, but it is likewise a crime to "countenance" the making of such a noise by a third party. The literal language would apparently create a duty on all persons in the vicinity of one making an improper noise at least to attempt to effect a termination thereof. If the citizenry took this duty seriously, it staggers the imagination to contemplate the result. There would be more action in the stands than on the field at any athletic event as spectators sought to protect themselves from violating the law against countenancing the improper noises being made by others about them.

Also proscribed is making, aiding, countenancing or assisting in the making of a "disturbance" which Webster defines in part as "an interruption of a state of peace or quiet," or "an interference with a planned, ordered or regular procedure, state or habit."[4] Again, this is both too vague and indefinite as well as overbroad. The legitimate exercise of freedom of speech, press or expression frequently interrupts a state of peace or

---

1. Webster, New International Dictionary (3d ed. 1961, Unabridged) p. 1137.

2. Webster, New International Dictionary (3d ed. 1961, Unabridged) p. 1533.

3. See Edwards v. South Carolina, 372 U.S. 229, 233, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). See, also, Cox v. State of Louisiana, 379 U.S. 536, 546–550, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). In *Cox*, the Louisiana Supreme Court, 244 La. 1087, 156 So.2d 448, defined the term "breach of peace" as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet." Id. at 551, 85 S.Ct. at 462. The Supreme Court of the United States held the statute unconstitutional, as construed by the Louisiana court, on the grounds that its broad scope intruded on the constitutionally protected rights of free speech and assembly. Id. at 552, 85 S.Ct. 453.

4. Webster, New International Dictionary (3d. ed. 1961, Unabridged, p. 661)

quiet or interferes with a planned, ordered or regular procedure, state or habit. New ideas more often than not create disturbances, yet the very purpose of the First Amendment is to stimulate the creation and dissemination of new concepts. The prohibition against making or countenancing a disburbance would literally make it a crime to deliver an unpopular speech which results in a "disturbance" or to stand by while someone else makes such a speech. This is clearly an invalid restriction of protected rights.

The distinction between "disturbance" and "riot" is, of course, very relevant. Webster defines the latter as "an assemblage of three or more persons in a public place for the purpose of accomplishment by concerted action and in a turbulent and disorderly manner a common purpose irrespective of the lawfulness of the purpose." [5] Nothing said here is intended to hold or imply that making or aiding or assisting to cause a riot may not be proscribed even though the actions taken consist merely in the exercise of First Amendment freedoms if the words spoken or written or the actions taken under the circumstances constitute a "clear and present danger" that a riot will result and the requisite intent to cause a riot is present.[6]

Under appropriate circumstances, such as often repeated requests or warnings to cease and desist from the protected activity in the face of growing tension and imminence of violence, the intent may even be inferred from the refusal to accede to such requests.[7] The accommodation between the maximum protection of free speech, peaceful assembly or peaceful demonstration and the necessity for maintaining the peace may, under special circumstances, warrant termination of the protected activities in the face of imminent violence but the first responsibility of the police is to protect to the maximum possible those engaged in the peaceful exercise of their rights.

The ordinance in its present form is not limited to clear and present danger situations nor does it include the requisite of intent.

Without going through the entire ordinance clause for clause or word for word, it is obvious that the ordinance suffers from other fatal defects. For example, it purports to make a crime the conduct of persons "who are *known to be* narcotic addicts, thieves, burglars, pickpockets, *robbers or confidence men*, either *by their own confession or otherwise*, or by having been convicted of larceny, burglary or other crime against the laws of the state who are found lounging in, prowling, or loitering around any steamboat landing, railroad depot, banking institution, place of public amusement, auction room, hotel, store, shop, public way, public conveyance, public gathering, public assembly, court room, public building, private dwelling house, house of ill-fame, gambling house, or any public place, and who are unable to give a *reasonable excuse for being so found*." (emphasis supplied)

This language has several constitutional infirmities. It is applicable by its terms to persons "known" to be narcotics addicts, thieves, etc., by virtue of prior conviction, confession or "otherwise." A number of questions immediately arise. Known by whom—the arresting officer, his superior or another officer who tells him, or neighbors or other civilians who tell the police. What independent investigation, if any, must the arresting officer make before relying on hearsay? What does "otherwise" connote as a bas-

5. Webster, New International Dictionary (3d ed. Unabridged, 1961) p. 1959.

6. See Dennis v. United States, 341 U.S. 494, 508–511, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); Herndon v. Lowry, 301 U.S. 242, 255–56, 258–259, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); Whitney v. People of State of California, 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (concurring opinion); Abrams v. United States, 250 U.S. 616, 627, 40 S.Ct. 17, 63 L.Ed. 1173 (1918) (dissenting opinion).

7. See Feiner v. People of State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951).

is for knowledge of the defendant's character? What constitutes "a reasonable excuse for being so found?" [8]

While a casual reading of the ordinance will reveal many other provisions with similar defects, the foregoing should be sufficient to demonstrate that the so-called "Disorderly Conduct" ordinance is both vague and indefinite as well as overbroad and therefore unconstitutional.

Defendants urge very vigorously that the ordinance has been considered on a number of occasions by the Illinois courts and found valid, and that, therefore, this Court is bound to reach the same conclusion.[9] Plaintiffs, on the other hand, contend that the ordinance in question was declared unconstitutional by the Supreme Court of the United States in 1949, and has been dead but unburied since then.[10]

In truth, both are partly correct and partly in error. Neither the Supreme Court of the United States nor the Illinois courts have ever been called upon to consider the ordinance in its entirety. Each has simply examined the facts of a given case and determined that the ordinance either was or was not constitutional as applied to those facts. As the companion opinion of the three-judge court observes, the adjudication of a particular case simply resolves the guilt or innocence of the defendant, it does not resolve the board question of the over-all constitutionality of the statute or ordinance involved nor its impact on federally protected rights. Of course, every case has implications beyond its own facts and holding, but an examination of all the prior opinions and decisions make it abundantly clear that neither the Supreme Court of the United States nor the Illinois courts, have ever ruled on the ordinance in its entirety. In a declara-

tory judgment action, we are called upon to do just that.

The time has come for the City of Chicago to adopt a modern ordinance which will enable it to discharge its responsibility for maintaining the peace while at the same time protecting its citizens in the enjoyment of their constitutional rights.

*The Resisting or Interfering Ordinance*

The second challenged ordinance, Section 33 of Chapter 11 of the Municipal Code, provides as follows:

> Any person who shall resist any officer of the police department in the discharge of his duties, or shall in any way interfere with or hinder or prevent him from discharging his duty as such officer, or shall offer or endeavor to do so, and whoever shall in any manner assist any person in the custody of any member of the police force to escape or attempt to escape from such custody, or attempt to rescue any person in custody shall be fined not less than Ten nor more than One Hundred Dollars for each offense.

A comparison of the ordinance with the related state statute found valid by the three-judge court in the companion opinion is enlightening and revealing. Omitted from the ordinance are several significant elements.

First, the state statute prescribes the requisite of intent by specifying that the person charged must have acted "knowingly." No similar requirement is contained in the ordinance.

Second, the state statute also provides that the person charged must have resisted or obstructed "one known to the person to be a peace officer," a further element of intent not present in the ordinance.

Third, the state statute is limited to action which "resists" or "obstructs" the

8. Cf. United States v. Margeson, 259 F. Supp. 256 (E.D.Pa.1966), in which a similar statute using the phrase "good account" instead of "reasonable excuse" was found unconstitutionally vague.

9. See, City of Chicago v. Joyce, 232 N.E. 2d 289 (Sup.Ct.Ill.1967); City of Chica-

go v. Lambert, 47 Ill.App.2d 151, 197 N.E. 2d 448 (1st Dist. 1964); City of Chicago v. Williams, 45 Ill.App.2d 327, 195 N.E. 2d 425 (1st Dist. 1936).

10. Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

authorized activity of a police officer while the ordinance makes it a crime to "resist" or "in any way to interfere with or hinder or prevent * * * or (shall) offer or endeavor to do so" any officer in the discharge of his duties.

Finally, the state statute requires that the resistance or obstruction relate to the performance by a peace officer "of any authorized act within his official capacity," a provision likewise absent from the ordinance though the terms "duty" or "duties" are urged to be the equivalent thereof.

■ As a result of these omissions, a person who inadvertently interferes with a peace officer whom he does not know is such violates the ordinance. Due process requires that knowledge and intent be essential elements of a crime.[11]

The phrases "in the discharge of his duties" or "from discharging his duty as such officer" are vague and indefinite and would cover unauthorized or excessive action by a peace officer in carrying out his duties.

While the terms "resist" and "obstruct" used in the state statute are relatively precise and connote some affirmative physical action, "interfere" or "offer or endeavor to do so" are vague and indefinite and could cover innocent interference by inaction or speech.

■ As is pointed out in the companion opinion of the three-judge court, the state and city have a legitimate interest in protecting peace officers and preventing frustration of valid enforcement of the law. Unfortunately, the ordinance goes far beyond the authority required to accomplish those objectives as well as being unconstitutionally vague and indefinite.

## CONCLUSION

The concluding observations of the companion opinion of the three-judge court are in large part relevant here and again are incorporated by reference. Though the applicable principles are the same, for the reasons set forth herein, the conclusions are different.

While both of the ordinances here challenged deal in part at least with matters clearly within the police power of the city, in their present form they are, among other things, vague and indefinite as well as overbroad.

As a result, they fail in some circumstances to define the conduct they seek to proscribe in terms understandable to persons of ordinary intelligence. Neither an average citizen nor an average policeman could reasonably be expected to govern his conduct by reference to them. In addition, applying them strictly according to the normal and natural meaning of their terms, they prohibit or impinge upon constitutionally protected freedoms. Accordingly, they must be declared unconstitutional and void.

Because of the importance both of preserving the peace in the community and protecting all the rights of all its citizens, the City should take immediate steps to enact constitutionally valid ordinances in this field.

An order consistent with the foregoing will enter.

11. See, e. g., United States v. Dennis, 341 U.S. 494, 499–500, 71 S.Ct. 857, 95 L. Ed. 1137 (1951); Bianchi v. United States, 219 F.2d 182, 196 (8th Cir.), cert. denied 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249, rehearing denied 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290 (1955); United States v. Bailes, 120 F.Supp. 614, 622–623 (S.D.W.Va.1954). Cf. Elfbrandt v. Russell, 384 U.S. 11, 19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966).