Martin **SLATE** et al., Plaintiffs-Appellants,

v.

William F. **McFETRIDGE** et al., Defendants-Appellees.

No. 71–1832.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1973.

Decided Aug. 30, 1973.

Rehearing Denied Sept. 28, 1973.

Gary H. Palm, Chicago, Ill., for plaintiffs-appellants.

Thomas M. Thomas, Francis B. Libbe, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, and PELL and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

Martin Slate and his fellow plaintiffs brought this action pursuant to 42 U.S. C. § 1983, seeking damages under the First Amendment for the refusal of defendants William F. McFetridge, Daniel J. Shannon and Thomas Barry, among others, to grant them a permit to use Chicago Park District facilities for a political rally during the week of the 1968 Democratic National Convention. Liability was also predicated on the alleged failure of the defendants to fortify the permit application procedure with safeguards required by due process. At the close of the evidence, and after the trial judge had denied a motion by plaintiffs for a directed verdict on both bases of liability, the case went to the jury solely on the First Amendment question. The trial judge refused to instruct the jury on the due process claim of plaintiffs. The jury found for the defendants, and judgment was entered accordingly. This appeal followed. We reverse, holding that it was error to deny plaintiffs' motion for a directed verdict, and remand for a determination of damages.

I

The facts critical to this appeal are not in dispute. They comprise a small part of the history which preceded the Democratic National Convention held in chicago during the week of August 25, 1968.

Plaintiffs were members and organizers of the Coalition for an Open Convention, an organization which aimed to bolster support for the nomination of Senator Eugene McCarthy among delegates to the Convention. As the climax of this undertaking, the Coalition planned to hold a large public rally in a Chicago park shortly before the Convention at which all candidates for nomination would be invited to present their views. Slate was chosen to arrange this event and secure its authorization by appropriate officials of the City of Chicago.

At that time, these officials included the defendants McFetridge and Shannon, members of the Board of Commissioners of the Chicago Park District, and defendant Barry, the acting General Superintendent of the Park District. Certain of their respective duties were enumerated in Section 4–17 of the Park District Code, which provided that the General Superintendent:

. . . shall, with the approval of the board of commissioners, promulgate and enforce compliance with rules and regulations governing the use of assembly halls, meeting halls, forums, reserved picnic areas, yacht harbors, automobile parking places at which no fees are charged, Soldier Field and Gately Stadium and other facilities of the park district, including among others, facilities for athletic or gymnastic exercises, swimming, boat-

ing and other sports, aeronautics, picnics, pageants and other activities. He may require that certain of such facilities may be used only upon the issuance of a permit by him, or by such subordinates as he may authorize to issue such permit. He may establish schedules of fees or charges for the use of such facilities in accordance with such rules and regulations, provided, however, that such fees and charges shall be reasonable, and provided further, that permits for the use of Soldier Field and Gately Stadium, and for the operation by any person or club of a facility located upon park lands or waters shall be issued only upon authorization by the board of commissioners in accordance with the provisions of Section 17–8.1 and other terms and restrictions fixed by the board of commissioners.

Section 17–8 of the Park District Code further provided:

No person shall hold, conduct or participate in any public meeting, assembly, picnic in a reserved picnic area, parade or procession in the park system unless a permit therefor has first been authorized by order of the board of commissioners and then only under such regulations and restrictions prescribed in said order as shall fully safeguard and subserve the public comfort, convenience, welfare, peace and safety and as shall be necessary for the protection and preservation of park district property from injury or damage; provided, however, that no permit shall be necessary for the holding of any public meeting or assembly at the following areas which are designated as public forums for the free interchange of views publicly by any person or persons or at other areas which the board of commissioners may from time to time, by ordinance, designate as such.

No other regulatory matter dealing with permits or procedures was on the books. In practice, the Board of Commissioners was not presented with a permit application under Section 17–8 unless the staff of the Park District, including the General Superintendent, had first decided that the request was meritorious and could be fulfilled.

The first member of the Park District staff encountered by Slate was John Trinka, who, as Director of Special Services, was responsible for permits and programs involving the Soldier Field facility. At a meeting on July 12, 1968, Trinka suggested that Slate contact Barry, since "there was tentative reservation for Soldier Field but he really wasn't very sure about it." Slate wrote Barry on July 13, repeating or enlarging his request for a sizeable park facility. This plea went unanswered though Barry received and read it. The reason, Barry maintained at trial, was that he took the July 13 letter to state a limited request for the use of Soldier Field, one which he could not then grant or discuss because of a prior reservation of that facility by the Democratic National Committee. After numerous unsuccessful attempts to reach Barry by phone, Slate mailed him another letter on July 25. Barry finally contacted Slate on or about July 29—the letter of July 25 having jarred his supposed conclusion as to what the first letter sought—and the two arranged a meeting for July 31.

What took place at that meeting is a subject of dispute. The first letter from Slate had requested "one of Chicago's largest parks, such as Grant or Washington, or Soldier's Field." Nevertheless, Barry insisted at trial that Slate came to their meeting in search solely for permission to use Soldier Field, which Barry denied on the spot in light of the prior reservation of that facility. According to Barry, he went on to assure Slate that the Coalition's application would get immediate consideration were this reservation cancelled. Slate's version of the event is that he requested permission to use any of the large park facilities controlled by the Park District, including Washington Park and Grant Park in addition to Soldier Field. His testimony agrees with that of Barry on other details of the meeting.

In any event, no response came from Barry following the meeting until August 13, when, after repeated prodding by various of the plaintiffs, he informed Slate that the pending application had not been acted upon by the Board of Commissioners. The reason, it turned out, was that Barry had decided not to place the matter on the agenda of the Board meeting set for August 13, nor otherwise to bring the application to the formal attention of the Commissioners.

Plaintiffs filed suit for injunctive and declaratory relief the next day. Their motion for a preliminary injunction was denied on August 19, and they cancelled their proposed rally. The complaint was subsequently amended to state a cause of action for damages. After the close of the evidence and after the trial judge had denied plaintiffs' motion for a directed verdict, plaintiffs tendered the following instruction:

The Court instructs the Jury that the Plaintiffs were entitled to "due process" of law in the consideration of their permit application. Due process requires that public officials in ruling upon an application or request for a permit to hold a public rally must:

1. Give a prospective applicant notice of the procedures to be followed in applying for such a permit.

2. After an application or request is made, promptly decide whether it will be granted and notify the applicant of that decision.

3. In the event the application or request is not granted, promptly provide applicant with a written statement of the reasons for such decision.

4. Afford an applicant whose permit or request has not been granted an opportunity to a prompt hearing at which he may support and explain his request, and refute the basis on which his request was denied.

5. Upon the completion of such a hearing, promptly decide whether the request will be granted and provide applicant with a written statement of the reasons for such decision.[1]

The trial judge refused the request and a verdict eventually was returned in favor of the defendants on the single issue of whether they reasonably refused plaintiffs a permit under the First Amendment.

II

■ Plaintiffs contest the denial of their motion for a directed verdict based on the failure of defendants duly to process the permit application, as well as the refusal of the trial judge to instruct the jury on the requirements of due process. We reach only the first of these contentions.

Defendants would have us uphold the trial judge in his refusal to direct a verdict on a theory of harmless albeit constitutional, error.[2] Slate, they say, requested a permit for Soldier Field alone, and not the strictest imaginable set of procedures would have changed the fact that this facility—committed to another by prior reservation—was not available for use by his organization. This position is in error. As is amply evident from the text of his written submittals to Barry, Slate did not view his permit request to be one directed solely to se-

---

1. This instruction mirrors the elements of due process which plaintiffs listed in their motion for a directed verdict.

2. Their position, in summary, is this:

It is plaintiffs' claim that they were denied First Amendment rights because defendants failed to make available to them a park facility on August 25, 26 or 27, 1968, for a political rally. They required a site that would accommodate 100,000

people. The only such facility was Soldier Field. It had been reserved for the President of the United States long before plaintiffs' request. . . . [A] different procedure for permit applications could not, and would not, have changed the fact of the prior reservation; nor would an application form, nor a deadline for decision, nor a written decision stating a reason, have given plaintiffs any more constitutional protection than they had.

curing the use of Soldier Field.[3] Nor does the verdict for defendants, as they imply, carry with it inevitably the inference that Barry was reasonable in considering Slate to have put in a permit request so limited. As instructed by the trial judge, the jury might well have found that the defendants were unreasonable in their view that Slate's request was this narrow, yet were reasonable nevertheless in denying a permit.[4] There is certainly ample evidence in the record to support at least the first branch of such a finding. Worse, defendants mistake or would obscure the basic thrust of plaintiffs' request for due process. Assume for the sake of argument that the communications which passed from Slate to Barry were sufficiently ambiguous to permit a reasonable conclusion that the use of Soldier Field alone was at issue; had there existed a requirement that Barry promptly state this conclusion in writing—say, for example, by responding in the negative to the application of July 13 shortly after its receipt—Slate would have had an ample opportunity to rectify the confusion and set the record straight as to the scope of the application. And if the provision of due process would have caused plaintiffs to realize more quickly than they did that no permit would or could be forthcoming, some of the expense of their preparations could have been avoided.[5]

Defendants were on more firm ground in the trial court, where they argued that the provision of due process was not required by constitutional or statutory law extant in July and August of 1968.[6] The trial judge evidently thought so; as best we can tell, this was the reason he denied plaintiffs a directed verdict on the issue of due process.[7]

---

3. See note 13, *infra*.

4. The instruction read as follows:

> The first is the issue as to whether or not the refusal, or the conclusion I should say, on the part of at least Mr. Barry, and to the extent that the other defendants were aware of it, the other defendants, the conclusion that the application which the plaintiffs were making was limited to Soldier Field. That is a big question in the case without any doubt, whether that was a reasonable conclusion from all of the evidence in the case. So, one issue is, were the defendants, and particularly Mr. Barry, reasonable in concluding that the application for a permit made by the plaintiffs was limited to Soldier Field.
>
> Now, if you conclude that they were reasonable in treating it as an application limited to Soldier Field, then you come to the next question, which is, were they reasonable in refusing to, or failing to issue a permit for Soldier Field under all the circumstances.
>
> *         *         *         *         *
>
> If you conclude that they were unreasonable in treating the application as one only for Soldier Field, you conclude in other words that a reasonable interpretation of the evidence is that they were applying for other sites as well as Soldier Field, then you have to come to the question as to whether their conduct in failing or refusing to issue a permit for the other site was reasonable.

5. By these observations we do not mean to suggest what damages the plaintiffs may be able to prove nor to limit the scope of that proof.

6. See their reply memorandum to plaintiffs' motion for rulings on matters of law, pp. 6–10. (Appeal Record, Doc. 194).

7. One of plaintiffs' arguments below was that Section 17–8 of the Park District Code was unconstitutional under Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The trial judge refused to direct a verdict for plaintiffs on this reasoning:

> Now, your [plaintiffs] second contention is that they [defendants] are like the policemen who arrest somebody for passing out handbills under an ordinance which any reasonable policeman would know is invalid because handbill ordinances have been uniformly declared invalid for years and years by almost every court higher than a Justice of the Peace.
>
> That is your position now. 17–8 is so clearly unconstitutional that they should not have been permitted to rely upon it and they should not now be permitted to rely upon it as a basis for conduct. They should have known it was so clearly unconstitutional.
>
> Then I think [defendants'] point is well taken. How can I say, prior to Shuttlesworth, they should have known. This is like Bowens against [Knazze, 237 F.Supp. 826 (N.D.Ill.1965)], very clearly. I said

■■■ It is a principle of elemental justice that a man not be held liable in damages for actions or omissions which he could not or should not be expected to have known would cause his liability. When he is a public servant, and when his acts are committed while he is arguably engaged in the pursuit of his official duties, strict liability becomes a proposition more weighty still, for good men may be deterred from the quest for public service by the imposition of such a burden. With these policies in mind, federal courts have reached a general consensus that liability for damages under 42 U.S.C. § 1983 must be determined by the legal standards in existence at the time of an alleged violation of constitutional rights. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Adams v. Carlson, 488 F.2d 619 (7th Cir. 1973); Gaito v. Strauss, 249 F.Supp. 923, 934–935 (W.D.Pa.), aff'd on other grounds, 368 F.2d 787 (3d Cir. 1966); Bowens v. Knazze, 237 F.Supp. 826 (N.D.Ill.1965); cf. Striker v. Pancher, 317 F.2d 780 (6th Cir. 1963). "[A] police officer," Pierson observed, "is not charged with predicting the future course of constitutional law." Nor is a commissioner of the Park District or his subordinates. The problem here does not lie with this basic proposition. It inheres instead, in the necessary determination of the constitutional standards which ruled the days of July and August 1968. In approaching this problem, we must be mindful of certain considerations.

As the underpinnings of the rule set out in *Pierson* suggest, courts should be wary of too broadly construing cases which set down the law of times past, particularly where new cases have widened the scope of doctrine earlier announced. Retroactive application of fresh precedent has no place in fixing the standard of conduct for damage suits under Section 1983. Thus, the narrow reading by a public official of a case on constitutional law must be upheld unless patently unreasonable and without arguable support in logic or policy. Nevertheless, we cannot fail to recognize that any case has boundaries of fair application which go beyond situations presenting the facts squarely before the deciding court on the occasion of decision. Every decision is possessed of a penumbra of analogues.

In 1965, the United States Supreme Court issued its decision in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), a case arising out of movie censorship in Maryland. Speaking to the procedural aspects of the State's decision to censor, the Court invalidated a provision which required

---

in Bowens . . ., until the Supreme Court ruled, the law of Illinois wasn't clear with respect to a second search. They said, okay, a second search is an unconstitutional search.

Then Mr. Bowens, who had been searched the second time by Mr. [Knazze] said, you violated my civil rights, and the Supreme Court of Illinois has so held. I said, not so fast Mr. Bowens, because we aren't going to make policemen be required to be smarter than the lower court judges, some four or five of whom had all held it was a valid search. The trial judge held it was a valid search, three judges of the Appeals Court said it was a valid search, and the Supreme Court said, you are wrong, it is an invalid search.

We are not going to hold those people responsible. I think Mr. Cusack's point with respect to Shuttlesworth is well taken. I am not going to require that the commissioners of the Park District be smarter than earlier justices of the Supreme Court because I think Shuttlesworth was a broader interpretation than the earlier cases with respect to what constitutes reasonable due process standards.

I happen to agree with Shuttlesworth, but that doesn't make it a basis for a cause of action against the commissioners of the Park District that they didn't anticipate Shuttlesworth, which is 1969, at the time that they were acting in 1968, and that they should have known that prior cases which said that this was not too vague a standard, were wrong and Shuttlesworth was going to come along and say you have got to do better than that, which it did, and I think they are right.

submission of films to a board of censors unrestricted by limits of time on the censors' deliberation. A new and rigorous code was substituted:

> First, the burden of proving that the film is unprotected expression must rest on the censor. . . . Second, while the State may require advance submission of all films, in order to proceed effectively to bar all showings of unprotected films, the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression. . . . To this end, the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, *within a specified brief period,* either issue a license or go to court to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. Moreover, we are well aware that, even after expiration of a temporary restraint, an administrative refusal to license, signifying the censor's view that the film is unprotected, may have a discouraging effect on the exhibitor. . . . Therefore, the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license. 380 U. S. at 58, 59, 85 S.Ct. at 739 (emphasis supplied).

Certain features of this mandate were further explored by the Court in the early months of 1968. An interval of fifty to fifty-seven days before final administrative action was disapproved as not satisfying the requirement in *Freedman* of a "specified brief period," Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968), while an interval defined by the earliest practicable time following twelve days was implicitly accepted by the Court. Interstate Circuit v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). The City of Chicago itself set an absolute twelve day limit for an administrative decision to censor following the decision in *Teitel.*[8]

Contrary to the assertion of plaintiffs, these are the cases which must govern the resolution of this appeal. The holdings in cases like Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), Collin v. Chicago Park District, 460 F.2d 746 (7th Cir. 1972), and LeFlore v. Robinson, 434 F. 2d 933 (5th Cir. 1970), vacated on other grounds, 446 F.2d 715 (5th Cir. 1971), came too late to inform the defendants of the duty they impose. We cannot hold them to that duty and be true to the principle of *Pierson.* This view also disposes of a number of due process requirements sought by plaintiffs. *Freedman* and its progeny of 1968 make no mention of notice regarding procedures, or of a hearing,[9] or of written statements of reasons; the list of procedures submitted by plaintiffs is silent as to censor-initiated judicial review, a censor-borne burden of proof, or a prompt judicial resolution of a censor's claim.[10] The only common ground existing between *Freedman* and plaintiffs' compendium is the requirement of a prompt administrative decision made known to the applicant. Whether defendants failed to fulfill that duty and erred constitutionally by so doing are the narrow issues remaining before us.

8. *See* Universal Film Exchanges, Inc. v. City of Chicago, 288 F.Supp. 286 (N.D.Ill.1968) (filed April 19, 1968).

9. One scholar, at least, has suggested that an administrative hearing should not be required by the Constitution. Blasi, Prior Restraints On Demonstrations, 68 Mich.L. Rev. 1481, 1552–55 (1970).

10. By "censor" we mean, of course, the licensing authority—here, the Board of Commissioners of the Chicago Park District.

Few would argue with the basic proposition that the protection of speech and assembly in the context of political parades and demonstrations is an object no less sacred to the First Amendment than the protection of the cinema from the censor. *See* Blasi, Prior Restraints On Demonstrations, 68 Mich.L.Rev. 1481 (1970). Others, including Mr. Justice Harlan, have gone one step beyond to assert the primacy of First Amendment rights in the former setting. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 162–163, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (Harlan, J., concurring); LeFlore v. Robinson, 434 F.2d 933 (5th Cir. 1970), vacated on other grounds, 446 F.2d 715 (5th Cir. 1971); Monaghan, First Amendment "Due Process," 83 Harv.L.Rev. 518, 519 (1970). We note, moreover, that in recent decisions both this and the Fifth Circuit proceeded directly from *Freedman* to decide that due process was to be afforded applicants for park permits. Collin v. Chicago Park District, *supra;* LeFlore v. Robinson, *supra; See also,* Stacy v. Williams, 306 F.Supp. 963, 973 (N.D.Miss.1969); Snyder v. Board of Trustees of Univ. of Ill., 286 F.Supp. 927, 936 (N.D.Ill.1968).

Defendants insist, nonetheless, that the *Freedman, Teitel* and *Interstate Circuit* cases compromise "unique law derivative from obscenity censorship," and did not include within their ambit a requirement of due process to plaintiffs when they applied for a park permit in July 1968. Two distinctions are proffered:

Unlike those wishing to sell books and show films who must act with the shadow of doubt as to whether such material is obscene, those seeking to use Soldier's Field know well beforehand if the facility is available.

\* \* \* \* \* \*

Board meetings are open to the public at which time permit applicants may appear . . . . [T]he plaintiffs never made an attempt to appear at a Board meeting, yet claim they were denied the opportunity to present written and oral argument in support of their application.

Decidedly unconvincing at best, we reject these as reasonable distinctions of *Freedman.* The first is based on defendants' central misconception of the case; the record does not support a conclusion that plaintiffs tendered a permit request which they knew was limited to Soldier Field, whatever Barry may have thought. The second embodies no distinction of *Freedman,* for that case did not require an administrative hearing. It also suffers from an ignorance of the actual procedures which the Park District employed in July 1968; without the approval of the General Superintendent, the permit applicant did not get his case before the Board of Commissioners. In this light, the right of appearance which is proposed would be a hollow one indeed. The makeweight character of defendants' distinctions, coupled with our recognition of the analogous importance in First Amendment terms of movie censorship and the regulation of political demonstrations, compels our conclusion that defendants had notice by *Freedman* that their prompt resolution of Slate's permit request was a dictate of due process in the protection of First Amendment rights.

Whether plaintiffs were afforded prompt consideration is the final question for our resolution. We know that Barry received and read a letter from Slate on July 13, requesting a permit for a facility at which to hold a rally:

From our preliminary estimates, we are confident that 100,000 people will be coming to Chicago during this week in August to voice their support for an open convention. We feel quite strongly that the city of Chicago in its interest in maintaining freedom of speech and assembly—*and at the same time, law and order*—could serve these ends by providing public park facilities for the series of rallies.

Given the size of the crowds expected, we feel that one of Chicago's largest

parks, such as Grant or Washington, or Soldier's Field, could best accomodate [sic] our rallies.

Over two weeks later—sixteen days to be exact—Barry called Slate to arrange a meeting. We can only guess at what caused this delay.[11] Whatever the reasons were, however, they cannot justify the tardy response on any view of the facts. Barry testified that the estimate of "100,000 people" caused him immediately to view the communication as a request for Soldier Field, the only facility, in his opinion, capable of filling this need. Assuming this to be true and justifiable, it was a foregone conclusion on July 13 or shortly thereafter that plaintiffs would not be getting a permit.[12] Barry's failure immediately to notify plaintiffs of this fact as the hours remaining before Convention time ticked away was a bald abuse of authority and an outright violation of the mandate in *Freedman* of prompt administrative action.[13] If, moreover, Barry did not in fact view the July 13 letter to be a sin-gle-facility request—an inference easily drawn in light of plaintiffs' expressed willingness in the July 13 letter to compromise on a rally site—Barry's delay is equally if not more reprehensible. A licensing authority is granted a reasonable period to rule on a permit application largely because time is needed for negotiations and the making of arrangements for and with the applicant. Surely this purpose is not served by allowing the official well over two weeks to sit on his hands. We hold that defendants are liable as a matter of law in damages for the delay in Barry's answer to plaintiffs, comprising, specifically, the period beginning with Barry's receipt of Slate's first letter and ending with Barry's call to Slate on July 29.[14]

The trial judge erred in not granting a directed verdict for the plaintiffs. Accordingly, the judgment appealed from is reversed. The amount of damages and their allocation are questions remaining for resolution. The case is remanded for such a determination.

---

11. Other than the justifications of Barry, we have a hint, if not more, in a letter written by Barry to McFetridge on July 17, 1968:
   Dear President McFetridge:
   "ON TO CHICAGO"
   Attached is a letter addressed to me requesting a meeting for a possible rally location in the Chicago Park District conducted by a group backing Senator McCarthy.
   Is it your wish that I meet with these people to consider this request?

12. Barry, after all, had only to consult his assistant Trinka or the publicized list of prior reservations—the existence of which *defendants stress so highly*—to determine that Soldier Field was reserved for the days Slate requested.

13. Defendants point to the fact that Slate had notice of the prior reservation of Soldier Field from a schedule of events for that facility authored by the Park District, as well as to the fact that Trinka made mention of the reservation when he met with Slate. Neither fact bears on the conduct of Barry, however. The July 13 letter of Slate requests "one of Chicago's largest parks, such as Grant or Washington, or Soldier's Field." While Barry may rightly have narrowed this plea in his own mind, he obviously could not have expected Slate to realize that a request for a facility to han-dle "100,000 people" necessarily limited to one the facilities available for his use. The letter speaks for itself. Furthermore, if we accept Barry's assertions that Soldier Field was the sole topic of discussion at his meeting with Slate on July 31 and that he promised Slate "consideration" in the event that Soldier Field became free, it is apparent that Slate was deprived of more than a timely notice of Barry's interpretation of the July 13 letter. He lacked, too, a timely assurance of being at least on a waiting list for the use of Soldier Field. The trial judge recognized, correctly, we think, that notice of both are required by the due process clause where a facility is unavailable to an applicant by virtue of a prior reservation.

14. Had Barry received Slate's letter of July 13 on July 29 instead, the actions which he took on and after July 29 would have been prompt under *Freedman* no matter whose version of the July 31 meeting is accepted. If Grant and Washington Parks were in truth discussed, then Slate had at least a chance to meet and negotiate with Barry. An administrative decision twelve days later was timely. If Barry is to be believed on his rendition of the July 31 conversation, plaintiffs got all they could ask for: a notice of prior reservation and a promise of consideration should the holder of the reservation cancel. They so conceded below.