Alice FOSTER and William Allen,
Plaintiffs-Appellees,

v.

J. ZEEKO and Guy DiBello et al.,
Defendants-Appellants.

No. 75–1993.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 17, 1976.

Decided Aug. 18, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 16, 1976.

Robert Retke, Asst. Corporation Counsel, Chicago, Ill., for defendants-appellants.

Gary H. Palm, Irving Geslewitz, Law Student, Mandel Legal Aid Clinic, Chicago, Ill., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from a summary judgment by which plaintiffs Alice Foster and William Allen in a civil rights suit recovered from the defendant Chicago police officers J. Zeeko and Guy DiBello the sum of $500.00 as damages for the deprivation of rights guaranteed by the First and Fourteenth Amendments.

On the evening of December 31, 1971, the defendant police officers Zeeko and DiBello arrested five persons attending a New Year's Eve party in an apartment located in the City of Chicago. The officers had earlier obtained a search warrant that commanded Joseph Chu be searched at the address of the apartment in question for the presence of marijuana.

On that day, Foster appeared before a judge of the Circuit Court of Cook County, Illinois, who denied leave to file the complaint against her. William Allen failed to appear, and a finding of guilty was entered against him in an ex parte proceeding with a fine of $25.00 being imposed. On July 24, 1972, Allen filed a motion to set aside the judgment and to dismiss the complaint pur-

suant to Ill.Rev.Stat. ch. 110, § 72, setting forth as one basis for relief the argument that § 193–2 of the Municipal Code of Chicago was unconstitutional. Circuit Court Judge Olson denied this motion, and plaintiff Allen thereafter took no action to appeal the judgment of conviction.

Subsequently, the plaintiffs brought suit seeking declaratory and injunctive relief as well as monetary damages pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3) and 1343(4). The defendants twice sought dismissal of the complaint, *inter alia,* on the grounds of abstention and comity spelled out in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Judge William Bauer, then serving as a district judge, twice denied this motion. Both parties later filed motions for summary judgment. The opposing parties filed stipulations of fact and memoranda of law, and both sides agreed that there were no issues of material fact. Subsequent to Judge Bauer coming to this court, the case was reassigned. Several months later, on March 13, 1975, the district court entered an unreported memorandum and order declaring § 193–2 unconstitutional on its face and void, denying an injunction against defendant Police Superintendent James Rochford and officers Zeeko and DiBello, ordering expungement of the plaintiffs' arrest records, and granting summary judgment in favor of the plaintiffs on the issue of liability, and entering summary judgment in favor of defendant James Conlisk. The parties later agreed that the amount of damages was properly fixed at $500.00; and on September 9, 1975, the court entered judgment in favor of the plaintiffs in that amount.

The district court held that as a matter of law the defendant police officers could not reasonably have believed that they could constitutionally arrest the plaintiffs under Chicago's "disorderly house" ordinance when the only misconduct alleged was that plaintiffs were present on the premises where narcotics were found. The court purported to rest upon legal standards in

effect on December 31, 1971. We agree that this is the focus date. The court noted that the United States Supreme Court had established guidelines for measuring the permissible reach of legislation affecting First Amendment freedoms. The district court ruled that the defendants were on notice at the time of the arrests that the "disorderly house" ordinance contained many constitutional infirmities and that "Section 193–1 of the Chicago Municipal Code, with wording similar to that of Section 193–2, was struck down by this Court [Northern District of Illinois] several years ago." *Landry v. Daley,* 280 F.Supp. 968 (N.D.Ill.1968), *appeal dismissed,* 410 F.2d 551 (7th Cir. 1969).

Although we will direct attention hereinafter to other specific portions of the district court's memorandum, we note at this point that while the court referred to "many constitutional infirmities," the only aspect mentioned specifically was with relation to the words "common . . . room . . . kept for the encouragement of idleness . . . ." The court then stated without specificity that "[t]hat there are obviously many other extreme examples of innocent or inadvertent conduct which would violate Section 193–2, resulting in denial of constitutional guarantees of freedom of association." Further, we note that in *Landry* the prime emphasis was on vagueness and overbreadth, as was the court's emphasis in the present case; but we have difficulty, as the district court did not, in discovering the similarity in language between the two ordinances.

Because of the length of Section 193–1 which is set out in full in *Landry* at 969, we will not extend this opinion by reproducing the ordinance herein. It will be sufficient to quote Judge Will's pungent characterization, *id.:*

This ordinance has to be one of the most charming grabbags of criminal prohibitions ever assembled. Some of its provisions are nostalgic though obviously obsolete. Jugglers or touts, ropers, steerers or cappers for gambling houses are today

as rare as buggy whips. Obsolescence, however, does not connote unconstitutionality.

The defendants have appealed only that part of the judgment awarding damages to the plaintiffs. Consequently the constitutionality of Section 193–2 is not directly before us. Necessarily, however, this unappealed issue retains meaningfulness insofar as it reflects upon the formulation of the principal issue in this case, i. e., whether police officers should be held personally liable in monetary damages as a matter of law when purporting to enforce an ordinance which itself had not been declared invalid at the time.

Citing, inter alia, Tritsis v. Backer, 501 F.2d 1021, 1022–23 (7th Cir. 1974), the plaintiffs on this appeal assert that while police officers under Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the seminal Section 1983 false arrest case decided by the United States Supreme Court, are allowed an affirmative defense of good faith when their actions are the subject of a damage suit for unlawful conduct ostensibly within the scope of their duties, nevertheless the standard of conduct is composed of two elements, the first being subjective and the second objective. As stated in Tritsis at 1022–23, "the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable." As we have previously noted, the focus time in considering the conduct of the police officers was the date of the arrest, December 31, 1971. The plaintiffs in the present case, as well as the district court, rest their case on the "objective" prong, i. e., that the officers should have known that the ordinance under which they were purporting to act was unconstitutional.[1]

■ There would appear to be little or no question that the double pronged standard is now applicable in gauging a defense against a Section 1983 action by public officials having a qualified immunity. The plaintiffs cite in addition to Tritsis a number of cases supportive of the proposition.[2] Of the cases cited only Joseph v. Rowlen was decided before the crucial 1971 date, which presents a preliminary question of whether the objective phase, as presently recognized, should be applicable to the defense of 1971 conduct. Joseph does not in direct terms treat the issue. Because that case is primarily an application of principles found in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and Pierson v. Ray, supra, we turn to those cases for further guidance. Monroe v. Pape, although not concerned with the matter of the scope of immunities, did establish that the specific intent to deprive a person of constitutional rights need not be proved in order to recover under Section 1983. The statute, the Court said, "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 U.S. at 187, 81 S.Ct. at 484. Applying that concept to the issue under consideration, we deem it unnecessary to cite authority for the proposition that tort liability is as firmly grounded upon what a person reasonably should have known as that which he actually knew.

■ In Pierson v. Ray, the Court held that the defense of good faith and probable cause, which the Court of Appeals had found available to the police officers in the common law action for false arrest, was also available to the officers in an action under Section 1983. While "good faith and probable cause" arguably do not sweep beyond a subjective standard, we are of the

---

1. In its opinion, the district court noted that the defendants had each filed affidavits in which they affirmed that they had acted in the belief that Section 193–2 was constitutional.

2. *Gumanis v. Donaldson,* 422 U.S. 1052, 95 S.Ct. 2673, 45 L.Ed.2d 705 (1975); *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland,* 420

U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Boscarino v. Nelson,* 518 F.2d 879, 881 (7th Cir. 1975); *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir. 1975), cert. denied, 423 U.S. 930, 96 S.Ct. 930, 46 L.Ed.2d 258; *Brubaker v. King,* 505 F.2d 534, 537 (7th Cir. 1974); *Joseph v. Rowlen,* 402 F.2d 367 (7th Cir. 1968).

opinion that the better view is that good faith as well as probable cause have implicit aspects of reasonableness of conduct. As stated by the Sixth Circuit in *Glasson, supra* at 910, the court "cannot permit a police officer to avoid liability for damages by pleading ignorance of the law when he unreasonably or in bad faith oversteps the bounds of his authority and invades the constitutional rights of others." We therefore will examine the conduct of the defendants in the light of whether they reasonably should have known that they were making arrests under a constitutionally infirm ordinance.

While the tort-liability equation would appear to underlie as a common denominator all of the qualified immunity cases, it appears to us that the application of the objective test must of necessity vary with the person and official position involved. We find no reason for not applying to police officers the approach indicated as applicable to officers of the executive branch of the government in *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), to the effect that the variation of the scope of the qualified immunity is "dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." See also the discussion of the range of qualified immunity protection in the recent case of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

In examining the objective reasonableness of the conduct of the present defendant police officers in making arrests under Section 193–2, we should not be unmindful of their responsibilities under the circumstance of most communities having an ever rising incidence of crime. The position of the police officer and the manner in which he or she should function constitutionally have been the subject of judicial attention. Thus, Chief Justice Burger, in speaking for the Court in *Scheuer,* noted that police officers in common with executive officers with a greater range of duties and authority

"must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Id.* at 246, 94 S.Ct. at 1691.

Chief Justice Warren also adverted to the subject in *Pierson v. Ray, supra,* 386 U.S. at 555, 87 S.Ct. at 1218, in frequently quoted language:

A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied. [Footnote omitted.]

In *Bowens v. Knazze,* 237 F.Supp. 826, 829 (N.D.Ill.1965), the matter was put as follows:

It would require law enforcement officers to respond in damages every time they miscalculated in regard to what a court of last resort would determine constituted an invasion of constitutional rights, even where, as here, a trial judge—more learned in the law than a police officer—held that no such violation occurred.

While ultimately holding the particular police officers in the case before it liable for a violation of civil rights and not permitting a police officer to avoid liability for damages by pleading ignorance of the law when he unreasonably or in bad faith oversteps the bounds of his authority and invades the constitutional rights of others, the Sixth Circuit in *Glasson v. City of Louisville, supra,* articulated the policy factors applicable to a police officer in the performance of his duties: "Every asserted justification must be considered carefully on a case by case basis, and due regard must be given to the fact that the officers may be acting in the urgency of a street confrontation and not in the contemplative atmosphere of judicial chambers." *Id.* at 908. "The law does not expect police officers to be sophisticated constitutional or criminal lawyers, but be-

cause they are charged with the responsibility of enforcing the law, it is not unreasonable to expect them to have some knowledge of it." *Id.* at 910. Speaking in a different context this court observed in *Slate v. McFetridge,* 484 F.2d 1169, 1174 (7th Cir. 1973), that "[r]etroactive application of fresh precedent has no place in fixing the standard of conduct for damage suits under Section 1983."

In the light of this sound policy umbrella under which police officers should be permitted to operate in their somewhat thankless task of protecting the communities which they serve, we turn to an examination of the constitutional atmosphere in which the defendants operated on December 31, 1971, insofar as acting under the ordinance section in question was concerned. The difficulty which we would hope to avoid is that of having the legal background survey result in such an intricate and highly technical syndrome which would give guidance to a legal scholar but which would not reflect any real illumination upon whether a police officer reasonably would have been aware that his basis for acting was constitutionally infirm. By referring to the December 1971 status of constitutional law applicable to the particular ordinance, we may not be able entirely to avoid that difficulty; i. e., to some extent we will be unable to avoid references to legal precedents reflecting upon constitutional law applicable to the particular ordinance as of December 1971 of which it would seem that police officers generally could not reasonably be expected to have become aware. The very increase of the difficulty, however, may well reflect upon the reasonableness of the likelihood of the officer having knowledge, whether we term that knowledge actual or constructive.

We now set forth various factors which we deem to be of significance on the present issue, although the order thereof bears no necessary relationship to relative significance.

1. Until the present action reached judgment, Section 193–2 had never been declared to be unconstitutional. Contrarily, the ordinance had been upheld in *City of Chicago v. Clark,* 359 Ill. 374, 194 N.E. 537 (1935). That decision, however, rested primarily on a theory of due process which simply required that every person have the protection of that person's day in court and not upon constitutional principles of vagueness or overbreadth. Nevertheless, there is no indication that any subsequent Illinois case has directly repudiated or overturned the *Clark* decision on any ground.

2. The state of Illinois had a statute which contained language substantially identical to that in Section 193–2. This statute has been upheld in judicial scrutiny. *People v. Russell,* 337 Ill.App. 665, 86 N.E.2d 588 (1949); *People v. Tucker,* 21 Ill.App.2d 46, 156 N.E.2d 873 (1959), aff'd, 18 Ill.2d 103, 163 N.E.2d 510 (1960), cert. denied, 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868. Neither of the reviewing courts, however, expressly reviewed the precedents relating to the concept of void for vagueness but confined their language to ruling that an information in the language of the state statute was sufficient.

3. The striking down of Section 193–1 in *Landry v. Daley, supra,* several years before 1971 appears to be only a faint beacon on the constitutional horizon insofar as Section 193–2 is concerned. We have already noted our inability to find the similarity in language between the two sections which was relied upon by the district court. The lengthy Section 193–1 made it unlawful, *inter alia,* for persons to make or aid in making any improper noise, to collect in crowds for unlawful purposes, to lodge in sheds, barns, stables and not give a good account of themselves, or to be known as narcotic addicts, thieves, burglars, pickpockets, robbers, or confidence men and found loitering or lounging in a great variety of specified places. Further, although Section 193–2 appears to be in sequential order in the Municipal Code following Section 193–1, there are four intervening ordinances: Sections 193–1.1, Inciting riots, etc.; 193–1.2, Drinking in Public; 193–1.3, Defacing and injuring house of worship and cemeteries; 193–1.4, Trespassing. The title of each or-

dinance contains the word "disorderly," but the elements comprising each appear clearly distinguishable.

4. In addition to *Landry*, the district court cited as a recent federal decision striking down "similar legislation on grounds of impermissible vagueness" the case of *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). In that case the vagrancy or disorderly conduct statute was not particularly similar in its language to Section 193–2 but did contain substantial similarities to the matters encompassed in the language of the ordinance involved in *Landry*. *Papachristou* was decided on February 24, 1972, approximately two months after our focus date. Even as to the dissimilar language of the disorderly conduct ordinances, it is of interest to note that the editors of The Bureau of National Affairs, Inc., in the Summary and Analysis section of The United States Law Week wrote of *Papachristou* that "[w]hatever doubt about the constitutionality of vagrancy laws remained after *Shuttlesworth v. Birmingham*, 382 U.S. 87 [86 S.Ct. 211, 15 L.Ed.2d 176]; *Coates v. City of Cincinnati[,]* 402 U.S. 611 [91 S.Ct. 1686, 29 L.Ed.2d 214] . . .; and *Palmer v. City of Euclid*, 402 U.S. 544, [91 S.Ct. 1563, 29 L.Ed.2d 98] . . . is put to rest by a unanimous U.S. Supreme Court." 40 U.S.L.W. 1131 (1972).

5. The plaintiffs in their complaint allege that arrests for violation of Section 193–2 are made by the Chicago Police Department without any hope of conviction because leave to file the complaint is routinely denied by the courts in these cases. There was no accompanying allegation as to why, if this was the case, the right to file was denied or that this came about because of a belief on the part of the state court judiciary that the section was unconstitutional. It is true that leave to file was denied as to plaintiff Foster. The complaint. was filed, however, as to plaintiff Allen, who did not appear, and a finding of guilty was entered. Some four months later, more than a half year subsequent to the

focus date, Allen filed a petition to set aside the judgment and dismiss the complaint. The accompanying brief mainly relied upon the unconstitutionality of Section 193–2, with particular emphasis on the claimed void for vagueness and overbreadth aspects. The petition was denied by the state circuit court judge. Apparently the judge was not persuaded despite being in the "contemplative atmosphere of judicial chambers" that the petitioner had been convicted of violation of an unconstitutional ordinance. The denial of the petition was not appealed.

6. As we have previously indicated, the district court's cynosure in the ordinance was the word "idleness." Irrespective of whether patronizing or being present in a room kept for the encouragement of idleness may have at one time been deemed to be a properly prosecutable offense, we have no reason for thinking it is so today or that it was in 1971. Indeed, 40 years earlier the Ninth Circuit affirmed lower courts in striking down a statute of the territory of Hawaii providing that any person who shall habitually loaf, loiter, and/or idle upon any public street or highway or in any public place shall be guilty of a misdemeanor. *Territory of Hawaii v. Anduha*, 48 F.2d 171, 173 (9th Cir. 1931):

> These words have no sinister meaning and imply no wrongdoing or misconduct on the part of those engaged in the prohibited practices. It is a matter of common knowledge, of which we must take judicial cognizance, that the majority of mankind spend a goodly part of their waking hours in whiling or idling the time away, and much of that time is spent on public streets and highways and in public places. Daylight saving laws have been enacted in order that those employed during the day may have more time at their disposal for recreation and pleasure; more time to idle, loiter, and loaf. On our streets daily are seen hundreds and even thousands of idle men who have nothing to do and no place to go, through no fault of their own, and are we to add to their misfortunes by declaring`them lawbreakers and criminals?

The defendants in the present case, however, from the record were not arresting Foster and Allen for being patrons of a disorderly house kept for the encouragement of idleness but rather one where narcotics were found. Keeping a disorderly house was a common law crime although generally, it would appear, statutes (as well as ordinances) have pre-empted the field. See 27 C.J.S. *Disorderly Houses* § 1 (1959). The ordinance under consideration here also included "other misbehavior." That, of course, it could be argued, has aspects of overbreadth. On the other hand, it could be argued that the phrase could be narrowed by state judicial construction to include only misbehavior constituting a crime in the state. Further, the part of the ordinance in question refers to the keeping of the house, and in this case the keeper was in violation of the marijuana laws of the state.

At this point a question of separability could be involved. The Supreme Court of Illinois addressed itself to the question in *The People v. Crowe,* 327 Ill. 106, 158 N.E. 451 (1927). After noting that the rule of construction of ordinances is the same as that applicable to statutes, the court observed, 327 Ill. at 119, 158 N.E. at 456:

> The fact that one part of the statute is unconstitutional does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the legislature would have passed the one without the other.

Beginning with this statement of the Illinois law we could quickly progress into the somewhat knotty and not clearly resolved problems of separability: whether the federal rule disfavoring separability or a contrary state rule should be applicable, what significance should be attached to single or multi-paragraphing, whether the result should be different in the case of a penal statute than that of a civil statute, whether the lack of a separability clause is significant, or whether the effect of the ordinance or the legislative intent would be thwarted by the excizing of "idleness"? For an analysis of the problems of this area of law, see 2 Sutherland Statutory Construction, Ch. 44, § 44.01 *et seq.* (4th Ed. 1973). We could but do not choose to pursue this esoteric route as we do not conceive that the ordinary police officer would knowingly be involved in such mental gymnastics while making an arrest under a common, long-on-the-books ordinance. While saying that, we must on the other hand recognize that the police officer might be simplistically achieving the same result that might result from judicial scrutiny through the separability lens by arresting persons who were patronizing a room in which law breaking was occurring. We also cannot disregard the fact that, at least as to the plaintiff Allen, the failure to pursue a state appeal deprived the defendants of a possible liability shield which might have resulted if the appellate courts of Illinois had had the opportunity by narrowing construction or applying separability principles to uphold the facial as well as the as-applied constitutionality of the ordinance.[3]

6. Legislation making the keeping of disorderly houses a law violation is not a

---

**3.** In the district court, relying, *inter alia,* upon *Palma v. Powers,* 295 F.Supp. 924 (N.D.Ill. 1969), the defendants moved to dismiss the complaint as to Allen on the basis that the denial of his motion in the state court to vacate the judgment against him on the basis of unconstitutionality collaterally estopped him from now challenging the constitutionality. This motion was denied by Judge Bauer in part because it would not be dispositive of the action inasmuch as it did not apply to the plaintiff Foster. The issue was not addressed in the final judgment memorandum and has not been pursued here.

It is interesting to note that in resisting the collateral estoppel argument in the district court, Allen argued that it would have been futile to have appealed because the issue of constitutionality had been decided in *Clark, supra.* In this court, the plaintiffs assert that reliance upon *Clark* is inapposite, pointing out its venerability and that the case did not decide the crucial questions of whether the ordinance was unconstitutionally vague and overbroad.

newcomer to the law. In *Harris v. United States,* 315 A.2d 569 (D.C.App.1974), the court in an *en banc* decision notes some historical aspects of the legislation. The opinion points out that the keeping of a disorderly house was recognized as a crime in the District of Columbia at least as early as 1826 and was later expressly held to be a common law offense. Congress shortly after 1910 enacted a statute for the District substantially similar to one before the court which was in the 1973 D.C.Code. The later statute in its entirety was as follows:

> Whoever is convicted of keeping a bawdy or disorderly house in the District shall be fined not more than $500 or imprisoned not more than one year, or both.

■ Initially we observe that venerability is not sufficient to save either legislation or police practices from successful attacks on constitutional grounds. We do not deem it necessary to cite authority for this obvious proposition; the sweep of constitutional protections is not mechanistically confined to the time or the mores of the effective date of its various provisions. While this is true in the case of direct attack, we are here not dealing with a direct attack but rather with what a police officer might reasonably know about the existence of continuing constitutional viability. We cannot say on that aspect that venerability is entirely devoid of significance.

Returning to *Harris,* the statute enacted by the United States Congress for the District of Columbia as examined by the court of the District suggests the rather paradoxical situation that if Section 193–2 had added no qualifying words at all such as idleness, gaming, drinking, etc., there might not have been a problem. The D.C. Court of Appeals read into the statute the common law meaning of a disorderly house being premises upon which activity occurred that either created a public disturbance or, although concealed from the public, constituted a nuisance *per se.* Generally speaking, a place of public resort where illegal practices are carried on in a manner proscribed by the state is a disorderly house. See 27 C.J.S. *Disorderly Houses* § 4(5), at 546.

For many years, the disorderly house statute of Illinois substantially was in accord with the Chicago ordinance, including reference to "idleness, gaming, drinking, fornication, or other misbehavior." Ill.Rev. Stat. Ch. 38, § 162 (1959). In the Municipal Code of 1961, municipal authorities were authorized to suppress disorderly houses. Ill.Rev.Stat. Ch. 24, § 11–5–1 (1975). In a statute enacted in 1965, and amended in 1973, dealing with public nuisances, it is significant to note the following language: "Any building used in the commission of offenses prohibited by [various specified sections of the Criminal Code] or prohibited by . . . the 'Cannabis Control Act' enacted by the 77th General Assembly, as heretofore and hereafter amended, or used in the commission of an inchoate offense relative to any of the aforesaid principal offenses is a public nuisance." Ill.Rev.Stat. Ch. 38, § 37–1 (1975).

We are not persuaded that it was a clearly established constitutional right, either in 1971 or at the present time, that one could attend a party at which marijuana smoking took place with complete immunity from the possibility of a valid arrest for patronizing a disorderly house. In so stating we have overly simplified other aspects of the case such as whether either frequenting or patronizing requires some regularity of attendance. These matters do not reflect, however, upon the matter of whether the police officers should reasonably have known that the ordinance was facially unconstitutional. Upon the matter of whether the ordinance was utilized in a way that police officers reasonably should have known was an unconstitutional application, the facts are insufficient in the record for us to express an opinion.

■ We note that the record we have does not show that the officers found anyone smoking marijuana or, with the exception of Joseph Chu, otherwise participating in a violation of the criminal laws. On the other hand, there is no indication that the officers were just roaming about in an

egregious manner seizing upon the slightest pretext to take into custody demonstrators or others whose conduct they considered unsocial. They had apparently demonstrated sufficient probable cause as to the principal occupant of the apartment to secure a search warrant as to him. One of the officers at least smelled marijuana smoke coming from the apartment. The record does not clearly reflect the lapse of time between this incident and the entry. Marijuana was discovered on one person in the apartment. We are not indicating that the officers may not have over reacted as to the other occupants. We do not, however, believe that moderate over reaction in the light of the necessities for effective law enforcement in the growing crime situation of this decade is an automatic basis for the assessment of damages against a police officer.

7. The district court adverted to the lack of a requirement of scienter in the ordinance. Irrespective of whether this might be the basis of striking down a statute on direct attack, as to which we express no opinion, we doubt that a police officer should be held to knowledge that an otherwise valid enactment was constitutionally deficient because of its omission of the element of scienter. We also note that the Third Circuit in *Government of the Virgin Islands v. Rodriguez*, 423 F.2d 9, 13 (3d Cir. 1970), approved the trend in the interpretation of federal criminal statutes to discover by implication a requirement of scienter, where there is no reason to suppose that the Congress, by deliberate choice, omitted such a requirement.

8. The plaintiffs contend that the conduct of the police officers was unreasonable because they did not inquire of their superiors concerning the continuing constitutional validity of the ordinance. The plaintiffs argue that basic tort law imposes a duty of inquiry on those persons engaged in an activity which creates a special relationship to others, citing, *inter alia,* W. Prosser, Handbook of the Law of Torts § 32, at 160 (4th ed. 1971). We do not say that the duty of inquiry should never exist. We are, however, of the opinion that more would have to be developed than is presently reflected in the record of this case for us to hold that the failure to inquire by the defendants before us should serve as a basis of liability for damages. The issue was not addressed in the judgment of the district court.

█ 9. Although there are or may be other factors bearing on the matter of whether the defendants were properly deprived of a qualified immunity insofar as being liable for damages is concerned, we are satisfied that the foregoing are sufficient to show enough legal uncertainty to demonstrate the impropriety of summary judgment disposition, irrespective of the agreement of the parties that the facts presented to the district court created no genuine issue of material fact.

█ "The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial." *Imbler, supra,* at 419 n.13, 96 S.Ct. at 989 n.13, 47 L.Ed.2d at 128 n.13. While it is true that we are here more concerned with the objective than the subjective state of mind of the defendants, we are of the opinion that the general rule of inappropriateness of summary judgment in actions involving state of mind, 10 Wright and Miller, Federal Practice and Procedure § 2730, at 582 *et seq.* (1973), is not without applicability here.

\*       \*       \*       \*       \*       \*

The appellants argue that under *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), the district court improperly exercised jurisdiction in this case. In *Huffman,* the Supreme Court held that the federal plaintiff was barred because it had chosen not to avail itself of its state appellate remedies, but had instead instituted suit in the federal court to obtain relief from a state court judgment. See also *Ellis v. Dyson,* 421 U.S. 426, 439–43, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975) (Powell, J., dissenting). However, in *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 928, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), the Court recognized that legally distinct parties are not always so closely related that "they should all be

subject to the *Younger* [*v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971),] considerations which govern any one of them . . . ."

█ We think that *Doran* is persuasive authority for the proposition that the district court rightly exercised jurisdiction over the Section 1983 claims of plaintiff Foster. Because there was jurisdiction under 28 U.S.C. § 1343 and the plaintiff Foster sought no interference with pending state criminal proceedings, *Younger* or *Huffman* abstention regarding her asserted claim would have been improper.

The posture of plaintiff Allen is different. Language in the *Huffman* opinion seemingly requires a person situated as he was to pursue all state appellate remedies. " . . . [W]e believe that a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court unless he can bring himself within one of the exceptions specified in *Younger*." 420 U.S. at 608, 95 S.Ct. at 1210. A number of factors influenced the Supreme Court in reaching that conclusion. Federal intervention prior to completion of state appellate proceedings would annul the result of a state trial and would also deprive the States of the legitimate function of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction. *Id.* at 609, 95 S.Ct. 1200. The Court noted that this was especially true when, as there, the constitutional issue involved a statute which was capable of judicial narrowing. *Id.* The Court did not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts. Accordingly, *Huffman* held "that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies." [Footnote omitted.]

█ While there is no pending state criminal litigation insofar as Allen is con-

cerned, that is true simply because of his choosing not to pursue available state court remedies. We do not believe that the underlying rationale of *Huffman* should be so easily circumvented. At the time this particular defense was rejected in the district court, *Huffman* had not been decided. *Huffman* now provides guidance which the district court did not have; and we are of the opinion, aside from any aspect of collateral estoppel, that Allen's election to drop state court proceedings also terminated his right to engage in the present challenge. We are not unmindful of the generally accepted principle enunciated in *Monroe v. Pape,* that the federal remedy under Section 1983 is supplementary to the state remedy and that the latter need not be first sought and refused before the federal one is invoked. Allen's move from the state to the federal court was premature under *Huffman.*

For the reasons set out hereinbefore the judgment of the district court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion as to the plaintiff Foster only.

REVERSED AND REMANDED.

FAIRCHILD, Chief Judge (concurring).

The City obtained a judgment against Allen. Implicit therein is a determination that the ordinance was constitutionally applied to him. Allen failed to appeal. Allen's opponents in the present action are different and perhaps not in privity with the City. In my view, however, the circumstances make it appropriate to hold Allen collaterally estopped from challenging the constitutionality of the ordinance in this action. See *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 606, fn. 18, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

Foster, of course, is not similarly estopped. The judgment in her favor rests upon the proposition that as a matter of law it was unreasonable for a police officer to believe in 1971 that the ordinance could constitutionally be applied to her. I can agree that that proposition cannot be sustained as a matter of law upon the facts

shown in this record and those which can be judicially noticed.